UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
FORT MYERS DIVISION

GEORGE M. BRITTAIN,

    Plaintiff,

v.                                                 CASE NO: 2:07-cv-234-FtM-99SPC

DALE SCHULS, et al.,

    Defendants.
_____/

## **O R D E R**

The plaintiff sues (Doc. 37) Sergeant Dale Schuls ("Schuls"), Sergeant Philip VanLandschoot ("VanLandschoot"), Deputy Robert Smith ("Smith"), Lance Armstrong ("Armstrong"), Katrina Lynn Frey ("Frey"), the City of Cape Coral, Florida ("Cape Coral"), and Sheriff Mike Scott ("Sheriff Scott") in his official capacity as the sheriff of Lee County, Florida. The four-count amended complaint asserts a civil rights claim under 42 U.S.C. § 1983 against Schuls, VanLandschoot, and Smith (Count I), a trespass claim against Schuls, VanLandschoot, Smith, Armstrong, and Frey (Count II), assault and battery claims against Schuls, VanLandschoot, Smith, Armstrong, and Frey (Count III), and a negligence claim against Cape Coral and Sheriff Scott (Count IV). The defendants Schuls, VanLandschoot, Smith, Sheriff Scott, and Cape Coral move (Docs. 44, 54) for summary judgment, and the plaintiff responds (Docs. 58, 62) in opposition. With leave of court, the defendants Schuls and VanLandschoot reply (Doc. 69) in support of the motions.

Factual Background

In 2005, the plaintiff and his wife, Dorelda Straley ("Straley") lived in and jointly owned a home in Cape Coral, Florida. On the morning of Sunday, July 24, 2005, the plaintiff asked Straley for a divorce, and Straley abruptly left the home to stay with her sister Frey. Because she left in a hurry, Straley needed to retrieve clothes and personal effects from the home. Because Straley remained unsure of the plaintiff's "state of mind" (Doc. 56-2 at 15), Straley and Frey went to the Cape Coral police department and requested dispatch of an officer to accompany Straley and Frey to the home. An officer was dispatched that afternoon and met Straley and Frey at the home. Upon arrival, Straley parked the family Lexus in the garage and informed her husband of her intention to recover some clothes from the closet.

After Straley began loading clothes and personal items into the Lexus, the plaintiff pulled his truck into the driveway to block the Lexus in the garage. The plaintiff claimed "possession" of the Lexus and refused to move the truck. While Straley and the plaintiff argued, Frey unlocked a window in the sewing room of the home. Straley and Frey left the home in the police vehicle (without Straley's purse or keys and only with the clothing Straley could carry to the police vehicle). (Doc. 56-2 at 23-24)

The next morning, Straley filed for a restraining order against the plaintiff in state court. The judge issued a "Temporary Injunction for Protection Against Domestic Violence Without Children." (Doc. 56-4 at 4) The injunction finds that Straley "is a victim of domestic violence by [the plaintiff], and/or [Straley] has reasonable cause to believe [she] is in imminent danger of becoming a victim of domestic violence by [the

plaintiff], and that there is immediate and present danger of domestic violence to [Straley] or persons lawfully with [Straley]."  (Doc. 56-4 at 5)  The injunction forbids the plaintiff from having any contact with Straley.  The injunction forbids the plaintiff's using or possessing a firearm and requires the plaintiff to surrender any firearm or ammunition to the Lee County Sheriff's Department.  Finally, the injunction awards Straley temporary, exclusive use and possession of the home.  The injunction directs a law enforcement officer with jurisdiction over the home to "accompany [Straley] to the home . . . and . . . place [Straley] in possession of the home."  (Doc. 56-4 at 7)  The injunction orders the Sheriff of Lee County to serve the injunction on the plaintiff "as soon as possible after its issuance."

That same morning, the plaintiff received a telephone call from a process server seeking to serve the plaintiff with the injunction.  The plaintiff refused the process server's request for a meeting (Doc. 56-3 at 103), and promptly called an attorney to discuss the meaning of the injunction.  (Doc. 56-3 at 147)  That afternoon, the plaintiff rented a moving truck and four storage units and asked his father to help him move personal property from the home.  The plaintiff and his father began removing property from the home "[t]o gain exclusive possession of that property."  (Doc. 56-3 at 151)  That evening, a man who the plaintiff assumed was the process server rang the doorbell, but the plaintiff refused to answer.

The plaintiff and his father spent the next two days (July 26 and 27, 2005) moving personal property from the home.  However, the plaintiff never left the home during these three days—the plaintiff's nephew and father moved the property from the truck

- 3 -

into the storage units.  (Doc. 56-3 at 153)  The process server came to the home and rang the doorbell twice each day, but the plaintiff refused to answer the door each time. (Doc. 56-3 at 104-07)

After three days without returning to her home, Straley became frustrated. "Nobody could seem to reach [the plaintiff], and they couldn't get to him; . . . 'I have got to get to my home.  I've got to get my clothes.  I've got to get my personal belongings. I've got to continue to work.  Something has got to happen.'"  (Doc. 56-2 at 28)  On the evening of July 27, 2005, Straley returned to the police station to request that a police officer accompany her to her home to gather some clothes and personal belongings. Schuls agreed to accompany Straley to the home, to help her retrieve personal belongings, and to allow Smith (a Lee County Sheriff's Deputy) to serve the plaintiff with the injunction.  Schuls, VanLandschoot, and Smith followed Straley, Frey, and Armstrong to the home.

The caravan convened at a church across the street from the home.  Straley refused to go to the door because she feared for her safety.  (Doc. 56-2)  Straley warned the police officers that the plaintiff "wasn't stable, he's a drug user, a controlling type person, drinks a lot, has access to firearms."  (Doc. 63 at 9)  Schuls and VanLandschoot approached the home, knocked on the front door, and announced their presence.  After receiving no response, Schuls and VanLandschoot walked around the home and "knocked on just about every opening on [the] house."  (Doc. 63 at 10)  The officers found only one light in the home—a lamp in the master bedroom.

Smith returned to the vehicle where Straley, Armstrong, and Frey waited.  Smith stated that the officers knew that the plaintiff was in the home and that the plaintiff would not answer the door.  Smith asked Straley, "We need to go ahead and get in.  Do we have your permission to get in?"  (Doc. 56-2 at 34)  Straley responded, "'Certainly. . . . I need my stuff.  I need my clothes.  I need my purse.  Yes, you may."  (Doc. 56-2 at 34)  Frey told Smith that he could "try the sewing window," which she had unlocked during Straley's first attempt to retrieve her personal property.  Armstrong followed Smith to "offer support" and to approach the plaintiff as a friend.  (Doc. 56-2 at 34)

Smith returned to the perimeter of the home and told Schuls that the sewing room window was unlocked.  Armstrong opened the window, and Schuls and Armstrong entered the home through the window.  While walking through the home, Schuls announced, "Sergeant Schuls, I'm from the police department, Cape Coral Police Department.  Mike, if you're here, let me know."  (Doc. 63 at 17)  Armstrong went to the garage and opened the garage door.  Schuls opened the door to the lanai to let VanLandschoot into the home and opened the front door to let Smith into the home.  (Doc. 56-4, ¶ 10)

The plaintiff denies hearing anyone announce himself as a police officer; however, the plaintiff recalls the officers stating, "We have business to take care of." (Doc. 56-3 at 43)  After hearing banging on the exterior doors to the home, the plaintiff retrieved a gun from a drawer and hid in a corner of the bedroom.  (Doc. 56-3 at 41)  A moment later, the plaintiff saw the reflection of a man standing in the living room. Several times the plaintiff demanded that the person standing in his living room leave

- 5 -

the home.  (Doc. 56-3 at 45)  After receiving no response to his demand, the plaintiff "stepped back three or four feet and fired a warning shot into the baseboard."  (Doc. 56-3 at 49)  The plaintiff fired the warning shot to alert the people in the home that "I was serious and to please not aggress on me any further."  (Doc. 56-3 at 49)

Schuls stepped back, checked himself for injury, and asked, "Mike, was that for me or for you?"  (Doc. 63 at 21)  The plaintiff responded that the shot was for Schuls.  (Doc. 63 at 21)  Schuls continued talking to the plaintiff in an attempt to gain the plaintiff's trust.  After the plaintiff fired the shot, VanLandschoot left the home and radioed for backup.  After twenty to thirty minutes, a Special Weapons and Tactics ("SWAT") team arrived at the home.  Two SWAT team negotiators replaced Schuls in the home, and the negotiators continued to talk to the plaintiff.  (Doc. 63 at 25)  Schuls left the home and retired to the SWAT command vehicle, which was parked away from the home.  (Doc. 56-4, ¶ 12)

After approximately fifteen to twenty more minutes, the plaintiff talked to his father on a cell phone.  The plaintiff's father informed the plaintiff that police officers had surrounded the home, and the father asked his son to surrender.  (Doc. 56-3 at 64)  The plaintiff stowed the gun in a nearby drawer and emerged from the bedroom with his hands raised.[1]  Upon entering the living room, the plaintiff saw several SWAT team members and several uniformed police officers.  The SWAT team members approached the plaintiff, and one of the officers handcuffed the plaintiff's hands behind his back.  While still inside the home, the arresting officer "slammed" the plaintiff on the ground.

---

[1] The circumstances of the plaintiff's surrender are hotly contested.  However, for purposes of summary judgment, the plaintiff's version of the facts is presumed true.

- 6 -

While the plaintiff was on the ground, several unidentified police officers allegedly kicked the plaintiff and stomped on the plaintiff's hands. Neither Schuls, VanLandschoot, nor Smith witnessed any officer stomp or kick the plaintiff, and the plaintiff cannot identify any of the officers who allegedly kicked the plaintiff during the arrest.[2] The arresting officer lifted the plaintiff from the floor and escorted the plaintiff through the front door and to a police car. After the arresting officer strapped the plaintiff in the police car, Smith served the injunction on the plaintiff. The plaintiff suffered bruises to his side and a broken finger.

## Standard of Review

Summary judgment is proper if the evidence shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure. A disputed fact is material if the fact "might affect the outcome of the suit under the governing law." Anderson v. Liberty

---

[2] Schuls and VanLandschoot each submit an affidavit (Docs. 56-4, 56-5) stating that he was not in the home during the plaintiff's arrest. Each officer swears that he did not "see anyone inappropriately touch, hit or kick Mr. Brittain nor did I ever touch, hit or kick Mr. Brittain. Finally, had I seen anyone inappropriately touch, hit or kick Mr. Brittain, I would have immediately intervened to stop the behavior." (Docs. 56-4, ¶ 12, 56-5, ¶ 9)

The plaintiff attempts to rebut Schuls's affidavit by arguing that Schuls "took over the position of a SWAT team leader" after being replaced in the home by the hostage negotiators. (Doc. 62 at 7) The plaintiff argues that "a reasonable inference can be made that if Sgt. Schuls was leading the SWAT team, and that team took the plaintiff into custody, then Sgt. Schuls was observing the 'take down.'" (Doc. 62 at 7) The plaintiff offers no evidence to support this inference, which is directly rebutted by Schuls's statement that he went immediately to the SWAT command vehicle (parked away from the home) after the negotiators arrived. The plaintiff's suggested inference that Schuls witnessed police officers kicking the plaintiff fails to create a genuine issue of material fact for trial.

The plaintiff attempts to rebut VanLandschoot's affidavit by arguing that VanLandschoot "has given diametrically opposed sworn statements about his observations on a critical fact." (Doc. 62 at 9) The plaintiff compares VanLandschoot's affidavit (Doc. 56-5) with his deposition (Doc. 64). To achieve this "diametric opposition," the plaintiff misquotes VanLandschoot's deposition by removing selected portions of the testimony. VanLandschoot's deposition reveals no "diametric opposition" and creates no genuine issue of material fact for trial.

Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the non-moving party."  Anderson, 477 U.S. at 248.  The movant bears the burden of establishing the absence of a dispute over a material fact.  Reynolds v. Bridgestone/Firestone, Inc., 989 F.2d 465, 469 (11th Cir. 1993).

If the party opposing summary judgment has the burden of proof at trial, the movant may discharge the initial burden by identifying a specific portion of the record that shows the absence of evidence to prove the opposing party's case at trial.  Alternatively, the movant may offer "affirmative evidence demonstrating that the non-moving party will be unable to prove its case at trial." United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437-38 (11th Cir. 1991).  Summary judgment is denied if the movant fails to meet the burden.

If the movant meets the initial burden, the burden shifts "to the non-moving party to demonstrate that there is indeed a material issue of fact that precludes summary judgment." Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir. 1991).  If the opposing party fails to show an issue of material fact on which it has the burden of proof at trial, the movant enjoys summary judgment.  Four Parcels of Real Prop., 941 F.2d at 1438.  The evidence and factual inferences from the evidence are viewed in the light most favorable to the party opposing summary judgment.  Reynolds, 989 F.2d at 469.  However, when "a motion for summary judgment is properly made and supported, an opposing party may not rely merely on allegations or denials in its own pleading; rather its response must—by affidavits or as otherwise provided in [Rule 56, Federal Rules of

Civil Procedure]—set out specific facts showing a genuine issue for trial. If the opposing party does not so respond, summary judgment should, if appropriate, be entered against that party." Rule 56(e)(2), Federal Rules of Civil Procedure; see also Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986). "'A mere 'scintilla' of evidence supporting the [non-moving] party's position will not suffice; there must be enough of a showing that the jury could reasonably find for that party.'" Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997) (quoting Walker v. Darby, 911 F.2d 1573, 1577 (11th Cir. 1990)).

## Discussion

In Count I, the plaintiff alleges that Schuls, VanLandschoot, and Smith violated the Fourth Amendment by (1) entering the plaintiff's home without a warrant and (2) failing to intervene when arresting officers used excessive force while arresting the plaintiff. Schuls, VanLandschoot, and Smith respond that Straley's consent to the officers' entering the home negates the Fourth Amendment's warrant requirement. The officers deny witnessing any excessive use of force and deny any opportunity to prevent the alleged excessive force used against the plaintiff. Finally, Schuls, VanLandschoot, and Smith assert entitlement to qualified immunity from liability for any constitutional violation suffered by the plaintiff.

Qualified immunity protects a government official performing a discretionary function "'from liability for civil damages insofar as [his] conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Priester v. City of Riviera Beach, 208 F.3d 919, 925 (11th Cir. 2000) (quoting

Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)).  This standard of objective reasonableness "'provides ample protection to all but the plainly incompetent or those who knowingly violate the law.'"  Priester, 208 F.3d at 925 (quoting Malley v. Briggs, 475 U.S. 335, 341 (1986)).  In this case, no party disputes that Schuls, VanLandschoot, and Smith acted within the scope of their employment as law enforcement officers at the pertinent time.  Thus, to overcome a qualified immunity defense, the plaintiff must submit evidence that Schuls, VanLandschoot, or Smith violated the plaintiff's constitutional rights.  See Purcell ex rel. Estate of Morgan v. Toombs County, 400 F.3d 1313, 1320 (11th Cir. 2005).  Second, the plaintiff must show that the law prohibiting the officer's conduct was clearly established at the time of the officer's conduct.  Saucier v. Katz, 533 U.S. 194, 201 (2001); Bates v. Harvey, 518 F.3d 1233, 1242 (11th Cir. 2008).  "For the law to be 'clearly established,' case law must ordinarily have been earlier developed in such a concrete and factually defined context to make it obvious to all reasonable government actors, in the defendant's place, that what he is doing violates federal law."  Priester, 208 F.3d at 926.  Saucier's prescribed sequence of analysis is no longer mandatory—a district court enjoys discretion "in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand."  Pearson v. Callahan, 129 S. Ct. 808, 818 (2009).

A. Warrantless Entry

The Fourth Amendment prescribes "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." Under most circumstances, a warrantless search of a home is per se unreasonable. Payton v. New York, 445 U.S. 573, 586 (1980). However, an officer may conduct a warrantless search after receiving "voluntary consent from an individual possessing authority" over the property. Georgia v. Randolph, 547 U.S. 103, 109 (2006). A "person with authority" includes "the householder against whom evidence is sought . . . or a fellow occupant who shares common authority" over the property. Randolph, 547 U.S. at 109.

An officer searching for evidence may not rely on the voluntary consent of an occupant if a fellow occupant is present and specifically objects to the search. Randolph, 547 U.S. at 114-17. The consent analysis changes, however, for an officer seeking to protect a victim of domestic abuse:

> No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence; so long as they have good reason to believe such a threat exists, it would be silly to suggest that the police would commit a tort by entering, say, to give a complaining tenant the opportunity to collect belongings and get out safely, or to determine whether violence (or threat of violence) has just occurred or is about to . . . occur, however much a spouse or other co-tenant objected. (And since the police would then be lawfully in the premises, there is no question that they could seize any evidence in plain view or take further action supported by any consequent probable cause.)

Randolph, 547 U.S. at 118.

In this case, the plaintiff argues that the officers violated the Fourth Amendment by entering the home over the plaintiff's objection. Although a factual issue exists

- 11 -

whether the plaintiff actually objected to the officers' entry before firing a "warning shot," Straley's consent coupled with the injunction directing a police officer to "place [Straley] in possession of the home" (Doc. 56-4 at 7) renders irrelevant any objection by the plaintiff. For the three days before the incident, the plaintiff avoided service of an injunction awarding Straley temporary and exclusive use and possession of the home. Nonetheless, at the time of the incident, the plaintiff was not even a lawful occupant of the home. Schuls, VanLandschoot, and Smith committed no constitutional violation by entering the plaintiff's home after receiving Straley's consent.

Furthermore, even if unconstitutional, the conduct of Schuls, VanLandschoot, and Smith enjoys qualified immunity. The events at the plaintiffs' home occurred in July, 2005—nearly eight months before the Supreme Court decided Randolph. Although Randolph confirms the unreasonableness of a police search over an objection by a physically present resident, the law of third-party consent was not clearly established in July, 2005. See Randolph, 547 U.S. at 108 n.1 (noting that all four Courts of Appeals to consider the effect of a present, co-tenant's objection to a consent search "have concluded that consent remains effective in the face of an express objection."); Thornton v. Lund, 538 F. Supp. 2d 1053, 1059 (E.D. Wis. 2008). Straley showed the officers a state court order finding that Straley "is a victim of domestic violence by [the plaintiff], and/or [Straley] has reasonable cause to believe [she] is in imminent danger of becoming a victim of domestic violence by [the plaintiff]." (Doc. 56-4 at 5) Under the circumstances, "[a] reasonable officer could have interpreted these averments as indicating a life or death emergency and felt compelled to execute the order with the

speed and immediate attention applicable in an emergency situation." See Bates v. Harvey, 518 F.3d 1233, 1249 (11th Cir. 2008) (granting qualified immunity to an officer who—without consent or exigent circumstance—entered a home to execute a civil commitment order).

B. Excessive Force and Failure to Intervene

"'The Fourth Amendment's freedom from unreasonable searches and seizures encompasses the plain right to be free from the use of excessive force in the course of an arrest.'" Vinyard v. Wilson, 311 F.3d 1340, 1347 (11th Cir. 2002) (quoting Lee v. Ferraro, 284 F. 3d 1188, 1197 (11th Cir. 2002)). The reasonableness of a seizure, in the constitutional context, is "a pure question of law." Scott v. Harris, 127 S. Ct. 1769, 1776 n.8 (2007). "Determining whether the force used to effect a particular seizure is 'reasonable' under the Fourth Amendment requires a careful balancing of 'the nature and quality of the intrusion on the individual's Fourth Amendment interests' against the countervailing government interests at stake." Graham v. Connor, 490 U.S. 386, 396 (1989) (quoting Tennessee v. Garner, 471 U.S. 1, 8 (1985)). "[T]he force used by a police officer in carrying out an arrest must be reasonably proportionate to the need for that force, which is measured by the severity of the crime, the danger to the officer, and the risk of flight." Lee, 284 F.3d at 1198.

"'The Fourth Amendment does not require officers to use the least intrusive or even less intrusive alternatives in search and seizure cases. The only test is whether what the police officers actually did was reasonable.'" Menuel v. City of Atlanta, 25 F.3d 990, 996-97 (11th Cir. 1994) (quoting Platkas v. Drinski, 19 F.3d 1143, 1149 (7th Cir.

1994)).  The reasonableness of a use of force is measured objectively and is "judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight."  Graham, 490 U.S. at 396.

In addition, "'an officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force, can be held liable for his nonfeasance.'"  Hadley v. Gutierrez, 526 F.3d 1324, 1330 (11th Cir. 2008) (quoting Velazquez v. City of Hialeah, 484 F.3d 1340, 1341 (11th Cir. 2007)).  This liability arises only if "the officer is in a position to intervene and fails to do so."  Priester v. City of Riviera Beach, 208 F.3d 919, 924 (11th Cir. 2000).

The plaintiff alleges that during his arrest "Schuls, VanLandschoot[,] Smith, and other law enforcement officers, despite no present resistance to them by the plaintiff, caused the plaintiff to sustain injury by beating, kicking and stomping him."  (Doc. 37, ¶ 6)  In his deposition, the plaintiff states that he was kicked and stomped after an officer handcuffed the plaintiff and threw the plaintiff to the ground.  (Doc. 56-3 at 68-69)  Although kicking a handcuffed, non-resisting suspect may constitute use of excessive force, see Hadley v. Gutierrez, 526 F.3d 1324, 1333 (11th Cir. 2008), Schuls, VanLandschoot, and Smith deny striking the plaintiff, and the plaintiff offers no evidence (through personal knowledge or otherwise) that any defendant participated in the alleged batteries sustained by the plaintiff.

The plaintiff also fails to provide evidence showing that any defendant was in a position to prevent the alleged brutality.  Schuls and VanLandschoot submit affidavits stating that they did not "see anyone inappropriately touch, hit or kick Mr. Brittain nor did

- 14 -

I ever touch, hit or kick Mr. Brittain. Finally, had I seen anyone inappropriately touch, hit or kick Mr. Brittain, I would have immediately intervened to stop the behavior." (Docs. 56-4, ¶ 12, 56-5, ¶ 9) In his deposition, the plaintiff acknowledges that the first time he recalls being within ten feet of Smith is when Smith served the plaintiff with the injunction while the plaintiff was strapped in the police car.

Schuls, VanLandschoot, and Smith present "affirmative evidence demonstrating that [the plaintiff] will be unable to prove [his] case at trial." See United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437-38 (11th Cir. 1991). Rule 56(e), Federal Rules of Civil Procedure, requires the plaintiff—by affidavit or as otherwise provided in Rule 56—to "set out specific facts showing a genuine issue for trial." The plaintiff's responses to the motions for summary judgment wholly fail to meet this burden. Accordingly, Schuls, VanLandschoot, and Smith are entitled to summary judgment on Count I.

## Conclusion

Smith and Sheriff Scott's motion (Doc. 44) for summary judgment is **GRANTED** as to Count I. Schuls, VanLandschoot, and Cape Coral's motion (Doc. 54) for summary judgment is **GRANTED** as to Count I. Pre-trial disposition of the plaintiff's Section 1983 claims, the sole basis for federal jurisdiction over this lawsuit, presents an occasion for discretion in exercising subject matter jurisdiction over the plaintiff's remaining claims. See 28 U.S.C. § 1367(c)(3). Accordingly, the exercise of supplemental jurisdiction over the plaintiff's remaining claims is **DECLINED**, and this action is **REMANDED** to the

Circuit Court for Lee County, Florida.  See 28 U.S.C. § 1447(c); Giordano v. City of New York, 274 F.3d 740, 755 (2d Cir. 2001); Hankins v. The Gap, Inc., 84 F.3d 797, 802-03 (6th Cir. 1996) (stating that summary judgment for the defendant on federal claims warrants declining exercise of supplemental jurisdiction over pendent state claims).  The Clerk is directed to (1) enter judgment on Count I against the plaintiff and in favor of the defendants Schuls, VanLandschoot, and Smith; (2) mail a certified copy of this order, pursuant to 28 U.S.C. § 1447(c), to the Clerk of the Circuit Court for Lee County, (3) terminate any pending motion, and (4) close the case.

ORDERED in Tampa, Florida, on February 18, 2009.

_____
STEVEN D. MERRYDAY
UNITED STATES DISTRICT JUDGE